

**TRANSPORTATION AGREEMENT**

| Carrier's Representative Contact: | Shipper: | Billing Address (if different): |
|---|---|---|
| Thomas Kinnard, Sales Manager | Michigan Salt Products, LLC | |
| | 1120 S. Lapeer Road, Suite 200 | |
| Telephone: 615-298-7518 | Oxford, MI 48371 | |
| Facsimile: 615-695-3278 | Attn: Andy Lindamood | |
| E-Mail: Thomas.kinnard@ingrambarge.com | | |
| | E-Mail: michigansalt@gmail.com | |
| Carrier: Ingram Barge Company | | |
| 4400 Harding Road, Nashville, TN 37205 | | |
| Carrier's Agreement: 109339/27309 | Shipper's Customer No: 21150 | Shipper's Customer No: |

This Transportation Agreement ("Agreement") is made effective as of May 1, 2019 by and between Carrier and Shipper (as identified above) and is for the transportation of dry cargo by barge under the terms and conditions of Parts I and II as set forth in this Agreement. The provisions of Part I and Part II shall both be accorded equal weight and shall be construed together in ascertaining the meaning of this Agreement.

## PART I

1. Term: May 15 – June 30, 2019
2. Equipment: Lift top covered barges
3. Cargo Type: Rock salt in bulk
4. Cargo Value: $700.000 per net ton or actual invoice value, whichever is less
5. Contract Tonnage: Approx. 65,000 N/T
6. Origin(s): Reserve, LA
7. Destination(s): Lemont, IL and/or Chicago, IL
8. Base Freight Rate(s): Lemont - $18.00 per N/T
   Chicago - $20.00 per N/T
9. Free Time: Six (6) days all purpose freetime – Sundays and Holidays included
10. Demurrage Rate: $300.00 per barge per day for the first 5 days; $400.00 per barge per day for the next 5 days then $550.00 per barge per day thereafter
11. Minimum Load Weight: 1,450 per rake barge    1,600 per box barge
12. Fuel Protection: Not Applicable
13. Cleaning Allowance: $1700.00 per barge (refer to Part II, Section 32)
14. Special Provisions: Any cover handling charges are for the account of the Carrier

In witness whereof, the parties have executed this Agreement as of the date first written above.

Carrier:  INGRAM BARGE COMPANY          Shipper: Michigan Salt Products, LLC
Signature: *[signed] Thomas Kinnard*       Signature: *[signed]*
By:  Thomas Kinnard                        By:  Andy Lindamood
Title:  Sales Manager                      Title: President

*Rev December 2018*

**EXHIBIT 2**

Contract No. 109339 / 27309

**PART II**

15. **Carrier and Shipper Parties.** Carrier and its affiliates and its and their employees, vendors, vessels, contractors, subcontractors at any tier or agents shall be referred to as a "Carrier Party"; provided, however that the term "Carrier Party" shall not include any Shipper Party (defined below). Shipper and its affiliates and its and their employees, vendors, vessels, contractors, subcontractors at any tier, or agents shall be referred to as a "Shipper Party"; provided, however that the term "Shipper Party" shall not include any Carrier Party.

16. **Cargo Description**: Prior to loading, Shipper will notify Carrier of the generic name of the cargo to be transported pursuant to this Agreement. In addition, Shipper will, if requested by Carrier, provide Material Safety Data Sheets (MSDS). Further, Shipper shall notify Carrier of the cargo classification under U. S. Coast Guard regulations and any other applicable regulations. In the event of Shipper's improper or incomplete description of the cargo or failure to disclose all necessary information about the cargo which results in any expense, loss, damage, and/or penalty to Carrier, Shipper agrees to reimburse Carrier for such expense, loss, damage, and/or penalty. Carrier shall not under any circumstances whatsoever be responsible or liable for any heat condition or combustion of any cargo, or any effects thereof, or any alleged failure to discover the same. If the cargo while on board the barge combusts, Shipper shall protect, defend, indemnify and hold Carrier harmless from and against (i) any damage or loss resulting from the claims of any third party, and (ii) for damage or loss to the barge carrying the product that combusted.

17. **Unit of Measurement**: Wherever used in this Agreement, the term "ton" shall mean a net ton of 2,000 pounds avoirdupois.

18. **Cargo Insurance**: Subject to the terms and conditions in Parts I and II, Carrier will, at its own expense, obtain and keep in full force and effect during the term of this Agreement, or any extension thereof, cargo insurance up to the Cargo Value stated in Part I, or the actual value of the cargo as of the date a cargo loss occurs, whichever is less. Carrier may elect to self-insure the cargo. In no case will Carrier be responsible for any cargo loss exceeding $700 per net ton.

19. **Weights**: Freight charges shall be calculated on the basis of loaded weights at origin. Carrier shall not assume any responsibility to weigh the cargo at origin or destination. Within 72 hours after completion of loading, Shipper shall submit to Carrier a written report descriptive of the cargo and the weight thereof per barge.

    If the actual weight of cargo cannot be ascertained upon completion of loading, estimated weights may be used for billing which shall be adjusted to out-turn weights at destination, if available, and applicable charges determined accordingly. If facilities for determining weight at destination are not available, the barge will be gauged before unloading, at Shipper's sole expense, and the weight thus ascertained will be used in determining the applicable charges.

    Upon Carrier's request, Shipper shall provide, or shall cause its vendor to provide proof of scale or gauged weights.

20. **Minimum Weights**: For each barge, the freight due from Shipper will be based on the actual tons loaded subject to the Minimum Load Weights specified in Part I.

    However, if the draft specified by Carrier will not allow the Shipper to load to the Minimum Load Weight amount, Shipper shall be charged for the Minimum Load Weight amount.

21. **Loading Requirements**: Shipper shall load a barge to the draft specified by Carrier. Shipper shall be governed by Carrier's instructions regarding the height of load, the tonnage of the cargo, the draft of the barge, and such other instructions as Carrier may in its sole discretion deem necessary for safe transportation where variable waterway conditions and anticipated weather conditions make such precautions desirable. Shipper shall be subject to any demurrage charges that may accrue due to the detention of any barge occasioned by non-compliance with Carrier's loading requirements specified herein. The Shipper shall load the barge so that the cargo is evenly distributed throughout the hopper hold; the Shipper shall not "center load" or "end load" a barge. Shipper shall be liable for any costs associated with any failure to load in accordance with this Section. Shipper shall be required to distribute cargo in each barge so as to ensure an even draft. If a barge is not loaded to ensure an even draft, Carrier reserves the right to refuse to accept the barge for transport. If Carrier refuses to accept any barge, Shipper must, at its expense, have the cargo redistributed to meet Carrier's requirements. In addition, the barge will be subject to demurrage charges, from the time and date of placement until the barge is accepted for transportation by Carrier.

22. **Transport of Barges**: A barge loaded with Shipper's cargo will move only at the convenience of Carrier, and either singly or with one or more other craft. Carrier will have the right to shift or interchange the tow from one to another towing vessel as frequently as it may find it convenient to do so, or to procure towage from any other vessel not owned or operated by

## PART II

Carrier; to tie off the tow at any point and for any purpose; and to deviate from its route, and visit any port whether or not on said route, and in any order. Carrier is not bound to transport any barges containing Shipper's cargo in time for any particular market.

If, due to operating conditions, it is necessary in the judgment of Carrier to delay the movement of barges while in transit, Carrier reserves the right to do so. Carrier makes no representation as to the time which will elapse between the acceptance of this Agreement until placement at origin, nor between departure of the barge from origin and arrival of the barge at destination; and under no circumstances shall Carrier be liable for any loss, damage, or expense incurred by Shipper or others by reason of delay. **CARRIER HEREBY DISCLAIMS ANY APPLICABLE IMPLIED WARRANTY OF WORKMANLIKE PERFORMANCE.**

23. **Inaccessible Points**: Carrier will not place barges for loading, nor pick up loaded barges, when the shipments are destined to ports or points which are inaccessible because of an actual or anticipated, temporary or permanent condition that adversely affects the navigability of a waterway to be traversed by barge between origin and destination. If shipment has been accepted or is re-consigned for transportation to a port or point which subsequently becomes inaccessible because of a condition that adversely affects the navigability of a waterway to be traversed between origin and destination, Carrier shall be privileged to tender delivery of such shipment at an accessible intermediate point nearest to consigned destination, in which event freight charges shall be adjusted in accordance with the transportation service actually rendered on the basis of the rate applicable for the movement to the original destination. In the determination of the inaccessibility of a destination port, the type and draft of propelling vessel, the type of barge, the loaded draft of barge, and necessity of returning empty barge, among other considerations, shall govern. Carrier's determination in this regard shall be final. In the event that operating conditions, including ice, prevent or delay the delivery of a barge, Carrier will place the barge at a point short of the point of interruption and the barge will be subject to demurrage.

24. **Accessorial Charges**: Except as otherwise provided, Carrier will not be liable for charges related to the following: ballasting, cleaning, demurrage, dockage, drayage, elevation, loading or unloading of cargo, opening or closing of barge hatch covers, removal or replacement of barge covers, sheddage, stacking or restacking of barge covers, switching tollage, wharfage, or any other terminal expense at either origin or destination. Notwithstanding anything contained herein, in the event that any Shipper Party fails to perform any of the above and any cargo degradation or damage is reasonably related to such failure, Shipper shall release, defend, indemnify, and hold Carrier and any Carrier Parties harmless from any and all liabilities and/or Losses related to such cargo damage.

25. **Shifting**: Rates stated herein will include only one shift of barges into and one shift out of loading and unloading facilities (from fleet to dock or dock to fleet). Any additional shifting of barges to accommodate loading, unloading or other requirements of Shipper or the loading or unloading facility will be for Shipper's account.

    When Shipper arranges for shifts to be made by someone other than Carrier, Shipper shall assume full responsibility for safety of barge and cargo thereof during such shifts, and further, Shipper shall defend, indemnify, and hold Carrier harmless for any damage or loss of any nature which may occur during such movements.

26. **Diversions, Re-Consignments, Holding in Transit, Stop-Offs for Partial Unloads**

    A barge may be diverted, re-consigned, held in transit to await orders, or stopped-off for partial unloads only with the consent of Carrier, which may be withheld for any reason. The cost, terms, and conditions of any agreement for re-consignment, diversion, holding in transit for orders, or partial stop-offs, must be confirmed in writing by all parties prior to Carrier's taking the requested action.

    Any barge that is stopped to permit a partial discharge will not be allowed any additional free time. All time incurred during a partial stop will count against free time and will thereafter be charged at the demurrage rate.

27. **Payment of Freight**: Upon loading, the entire amount of the freight charge will become earned and due and payable to Carrier in cash and without discount, even though the barge or cargo is lost or not lost, damaged or not damaged, in whole or in part, at any stage of the voyage. Carrier does not have to deliver the cargo until all freight and demurrage due hereunder have been paid by Shipper. The actual date of loading, not placement date nor requested date, shall govern as to what freight rate shall be invoiced.

    Interest at a rate of two percent (2%) per month (or any fraction thereof) or the maximum interest rate allowed by law, shall accrue on any payment obligations hereunder that are past due until such payment obligations are satisfied in full together with said interest. If any agency or attorney is employed to assist in the collection of such payment obligation, then the delinquent party also shall be required to pay such agency/attorney a reasonable fee relating to such collection.

# PART II

Carrier has the right to defer placement of any barge and/or delivery of the cargo if Shipper's payment obligations are past due until such time as all amounts due Carrier are paid in full.

Notwithstanding the above, Shipper may be granted credit by Carrier's Credit Manager, in which case the monies owed must be paid by the Shipper within 30 days from the date of the invoice or within the number of days specified by Carrier's Credit Manager. Carrier's Credit Manager has complete discretion as to whether or not credit is to be extended to Shipper, the amount of credit to be granted to Shipper, and the payment due date from the Shipper, and the form of payment. Shipper is to comply with all reasonable requests for financial information by Carrier's Credit Manager in order to establish Shipper's credit. Carrier's Credit Manager may change or cancel the extension and amount of credit and the payment due date or the form of the payment at the Credit Manager's sole discretion and at any time.

28. **Lien**: Carrier will have a lien upon all cargo for any freight, demurrage or any other amounts arising out of this Agreement, or upon any breach or repudiation (anticipatory or otherwise) hereof, which lien will survive the delivery of such cargo.

29. **Demurrage and Free Time**: The free time to be allowed is to be that which is specified in Part I. No free time will be allowed on empty barges placed upon Shipper's request for placement if, subsequent to placement, such order is cancelled.

    After the period of free time has expired, the demurrage charges specified under this Agreement will accrue for each day including Saturdays, Sundays, and National Holidays, until the barge is released to Carrier. All such charges will be invoiced and paid in accordance with the terms set forth herein.

    Unless otherwise specifically provided in Part I, time will be computed for the total period barge is in Shipper's possession for loading or for unloading and will begin as of the first 7:00 a.m. after barge is actually or constructively placed for loading or for unloading and will run until Carrier has been notified in writing that barge has completed loading or unloading and is available for pick up. The written release must be received by Carrier by 11:00 a.m. (Nashville time) or the barge will not be considered as having been released by 7:00 a.m. In computing time, days will consist of 24 hours running from 7:00 a.m. until the next 7:00 a.m. A fraction of a day will be considered as one day. Notwithstanding the foregoing, in the event a barge is placed after 7:00 a.m. and released prior to 7:00 a.m. the immediately following day, one (1) free day will be used.

    When Carrier, for its convenience, places a barge for loading prior to date specified by Shipper, time will run from the first 7:00 a.m. of the date specified by Shipper or from 7:00 a.m. of the date when actual loading began, whichever occurs sooner.

    Actual placement is made by Carrier when barge is placed for loading or unloading at docks or wharves specified by Shipper or at a nearby fleet selected by Carrier, whichever occurs first.

    Constructive placement consists of placing or holding a barge at a point of Carrier's or Shipper's choice near the specified actual delivery point. Notice of such placement will be given to Shipper. In making any subsequent placement, no free time in addition to that provided will be allowed by Carrier.

    Except as otherwise provided for herein, if Carrier is prevented from making actual placement by any cause over which it has no control, such barge will be subject to constructive placement. Constructive placement will be made by Carrier when actual placement is not possible.

    If holidays are excluded from Free Time, the following are the holidays to be recognized: New Year's Day; Memorial Day; Independence Day; Labor Day; Easter Sunday; Thanksgiving Day; Christmas Day

    If the holiday (except for Easter) falls on a Sunday, the following Monday shall be considered as the holiday. If a barge is on demurrage and the Shipper requests a reconsignment, the barge will remain on demurrage, even during transit, until the barge is released back to Carrier.

    In the event that delivery of a barge involves a destination beyond the lake front entrance to Lake Michigan, the barge will be placed in a fleet of Carrier's choosing on the Illinois River Waterway and free time and demurrage shall commence upon placement in the fleet. Adverse weather conditions which delay transit and barge delivery to destinations on Lake Michigan will not be considered Force Majeure events. It is the Shipper's responsibility to notify the loading/unloading terminal of the barge placement in the Illinois River Waterway fleet.

Contract No. 109339 / 27309

**PART II**

30. **Fuel Protection**: Unless otherwise specifically set forth in Part I, during each month of this Agreement the Base Freight Rate(s) shall be subject to adjustment for fuel during the term of this Agreement in the event of an increase in the cost of fuel above the cost per gallon specified in Part I. If the actual average cost of fuel to Carrier for the second month immediately preceding the month of shipment rises above the specified cost per gallon, Carrier shall adjust the Base Freight Rate on the first of every month during the term of this Agreement in accordance with the following formula:

$$[\text{Base Freight Rate} \times 30\% \times (\underline{\text{Actual Fuel Cost} - \text{Fuel Protection Level}})] + \text{Base Freight Rate} = \text{Adjusted Freight Rate}$$
$$\text{Fuel Protection Level}$$

As an example, the actual fuel cost for the month of October would determine the December rates. In no event will the Adjusted Freight Rate ever be lower than the Base Freight Rate.

31. **Ratability**: Shipper shall ship the Contract Tonnage in approximately equal monthly increments and approximately equal weekly increments within each month. Should the Shipper fail to ship ratably as described above, Carrier has the right to adjust its obligation to provide barges for the remainder of this Agreement; provided, however, that such right shall not be construed to reduce or otherwise alter Shipper's obligations with respect to tonnages as set forth herein. Carrier will not be obligated to supply a number of barges in any one month that is greater than (i) the actual number of barges shipped in the prior month under this Agreement, or (ii) the monthly average number of barges shipped in the prior months under this Agreement, whichever is less. Barges not loaded ratably within a week or within a month cannot be carried forward to the following week or month, unless Carrier agrees to do so.

Unless otherwise set forth in Part I, Section 14, subject to the terms and conditions set forth herein, Carrier shall not have an obligation to provide any specific barge, or any specific set of barges for the transportation of cargo contemplated herein. Furthermore, Carrier's consistent use of a specific barge or set of barges shall not be construed to mean that such barge or barges have been dedicated to such transportation.

32. **Cleaning**: Carrier shall absorb cleaning costs up to amount specified in Part I to remove cargo left in the hopper by shipper. All cleaning costs above the stipulated allowance are for the account of the Shipper. Shipper shall remove all dunnage, if any, at its sole expense. All cargo remaining in the hopper following unloading shall be deemed abandoned.

If any cargo or debris is spilled or deposited on the exterior of the barge (including working surfaces, such as gunnels, covers, or decks) at either loading or unloading points, Shipper is responsible for all costs associated with cleaning the exterior of the barge. Carrier may refuse to pick up or move a barge if an amount of cargo is left in the hopper or if cargo or debris is left or spilled on the barge if, in Carrier's sole judgment, the cargo or debris left aboard represents a safety hazard to its crew or to other parties who may come in contact with the barge. Carrier will require the Shipper to clean or remove all amounts of cargo left on board or to remove the cargo or debris that represents a safety hazard prior to movement. In such case, if the movement of a barge is delayed while the barge is being cleaned by the Shipper, then the Shipper shall be liable to Carrier for the days consumed at the then applicable demurrage rate. Further, if Carrier arranges to have a barge cleaned due to amounts of cargo left in the hopper or if cargo or debris is left or spilled on the barge, the Shipper shall be liable to Carrier for the days consumed at the then applicable demurrage rate. Acceptance of a barge by Carrier is not to be construed as evidence that a barge was properly cleaned by Shipper.

33. **Unloading**: It shall be the obligation of Shipper, or its consignee, to unload and remove the cargo from the barge, including any cargo or debris spilled on the working surfaces, promptly following placement. If any of the cargo is not so unloaded and removed, then Carrier, at its option, shall be entitled to remove, sell or otherwise dispose of all cargo. In the event that any cargo remains in the barges for a period of more than ninety (90) days, Shipper shall release Carrier Parties from any and all claims related to the quality and/or condition of the cargo. Shipper shall be responsible for any and all costs related to such removal, sale or disposal including but not limited to any cargo inspections, tests, and any and all brokerage fees and/or commissions.

34. **Possession of the Barge during Loading/Unloading**: Carrier shall deliver an empty or loaded barge to a loading/unloading facility designated by Shipper for loading or unloading (unless constructively placed). Shipper shall assume the duty and responsibility for the safety of each barge following delivery and prior to pick-up. For the purposes of this Agreement, a barge will be deemed delivered when it has been tied off by or on behalf of Carrier at the dock or mooring facility designated by Shipper, and it will be deemed picked up when it has been released by Shipper and untied by or on behalf of Carrier from such dock or mooring facility following loading or unloading. Shipper shall provide adequate mooring, loading, and unloading facilities at origins and destinations free of expense to Carrier.

Contract No. 109339 / 27309

# PART II

35. **Safe Berth**: Shipper warrants the barge shall have a safe berth of not less than nine (9) feet of draft. The barge shall not be permitted, at any time, to touch bottom while in the Shipper's control.

36. **Mooring**: Shipper warrants that barges will be safely and adequately moored free of wharfage, dockage, port and harbor charges at the loading and unloading points and that barges will have warning lights properly displayed as required by applicable U.S. Coast Guard and U.S. Army Corps of Engineers regulations and permits. While barges are in the care and custody of Shipper, or its agents, all U.S. Coast Guard and U.S. Army Corps of Engineers regulations will be complied with, and in the event that Carrier should in any manner be held responsible for Shipper's, or its agents' acts or omissions in compliance with the mooring requirements herein provided, then Shipper agrees to indemnify and save harmless Carrier from all such responsibility and liability.

37. **Request for Placement:** Shipper must send Carrier a written request for placement with a specific loading date and the designated origin for loading. Carrier requires a minimum of 14 days' notice for any loading; should Shipper fail to supply 14 days' advance notice of a loading, Carrier has the right to adjust its obligation to provide barges for loading.

38. **Change in Requested Loading Date or Origin:** Any change by the Shipper in the requested loading date or designated origin given to Carrier which is in excess of five (5) working days prior to the previously requested loading date will be accepted by Carrier without charge. Any change by the Shipper in the requested loading date or origin given to Carrier on less than five (5) working days' notice may subject the Shipper to charges (including but not limited to assessment of free days, and additional charges for shifting, fleeting, barge cleaning, or cover handling).

39. **Acceptance:** Carrier will tender barges which are in a commercially suitable condition for the cargo to be carried. Loading of the barges will constitute Shipper's acceptance of the condition and suitability of the barges for the intended cargo.

40. **Release**: Neither Carrier nor Shipper shall be liable for incidental or consequential damages under any circumstances. Nothing contained herein shall render Carrier responsible for the differences in the inturn weight and the outturn weight of cargo from barges safely delivered and unloaded.

41. **INDEMNITY**: (a) Carrier will protect, defend, indemnify and hold Shipper Parties harmless from and against all losses, damages, injuries, liabilities, judgments, claims and expenses, including without limitation penalties for violation of laws and pollution cleanup costs and reasonable attorney's fees (collectively "Losses") arising from or related to (i) Carrier's breach of this Agreement, and/or (ii) the negligence, gross negligence, recklessness or intentional misconduct of Carrier Parties, except to the extent of the negligence, gross negligence, recklessness or intentional misconduct of Shipper Parties; and except for Losses covered by the last sentence of Section 41(b). In addition, Carrier will protect, defend, indemnify and hold Shipper Parties harmless from and against any and all Losses arising from or related to any injury, illness and/or death of the employees of any Carrier Party regardless of cause, including the sole, joint, or concurrent negligence or fault (whether active, passive, and/or gross), any tort, any strict liability or any other theory of liability which may be available against any Shipper Party, either at law or in equity.

(b) Shipper will protect, defend, indemnify and hold Carrier Parties harmless from and against any and all Losses arising from or related to (i) Shipper's breach of this agreement, and/or (ii) the negligence, gross negligence, recklessness or intentional misconduct of Shipper Parties, except to the extent of the negligence, gross negligence, recklessness or intentional misconduct of Carrier Parties; and except for any Loss covered by the last sentence of Section 41(a). In addition, Shipper will protect, defend, indemnify and hold Carrier Parties harmless from and against any and all Losses arising from or related to any injury, illness and/or death of any employees of any Shipper Party, regardless of cause, including the sole, joint, or concurrent negligence or fault (whether active, passive, and/or gross), any tort, any strict liability or any other theory of liability which may be available against any Carrier Party, either at law or in equity.

42. **Insurance.** During the Term of this Agreement, Shipper shall procure and maintain, or shall cause its vendors, contractors, subcontractors or agents to procure and maintain, during the Term of this Agreement, Longshore and Harbor Workers' Compensation Act Insurance or Workers' Compensation Insurance, whichever is applicable, covering Shipper's responsibilities with respect to all workers at the docks and fleets at all origins, destinations and other locations operated by Shipper or its vendors, contractors, subcontractors or agents, and Comprehensive Marine Liability Insurance (in any combination of primary and excess coverage), including but not limited to Protection and Indemnity Liability, Jones Act (Maritime Employers Liability), Pollution Liability, Full Collision Liability, Marine Operators Liability, Marine Contractual Liability, Wharfingers Liability, Towers' Liability, Hull and Cargo Legal Liability and Cost of Removal of Wreck and Cargo (including voluntary or statutory), where applicable, covering the docks and fleets at all origins, destinations and other locations operated by Shipper or its vendors, contractors, subcontractors or agents, in an amount not less than Ten Million Dollars ($10,000,000) per occurrence. All such policies shall contain waivers of the insurers' subrogation rights against

Contract No. 109339 / 27309

PART II

Carrier and their affiliates, subcontractors and vessels; and the Comprehensive Marine Liability policy shall name Carrier and its subcontractors as additional assureds to the extent of the liability assumed by Shipper under this Agreement. The above policies shall be considered primary to any other insurance maintained by Carrier, and such policies shall provide that naming other parties as additional assureds and granting them waivers of subrogation will in no way impair the rights otherwise inuring to such parties. Within 30 days after the commencement of this Agreement, Shipper shall furnish to Carrier a certificate, in customary form, evidencing the required insurance (including that of all vendors, contractors, subcontractors or agents performing services related to this Agreement) and providing that Carrier shall be given at least (30) days' prior written notice of cancellation or material change in the provisions of such insurance.

43. **Force Majeure**: Performance under this Agreement by Shipper and Carrier shall be excused to the extent such performance is prevented by Force Majeure, provided the party declaring Force Majeure gives written notice of such condition to the other party within a reasonable period of time after commencement of the Force Majeure condition. The term "Force Majeure" shall include acts of God or the elements, acts of a public enemy, insurrections, riots, strikes, labor disputes, fires, explosions, floods, accidents of navigation, ice, high or low water, embargoes, acts or orders of civil or military authorities, lock delays or closings, fuel shortages or other causes beyond the reasonable control of the party declaring Force Majeure. Force Majeure shall not be construed to include (i) any condition or change in condition of any local, regional, national or international market and/or economy, or (ii) any breakdown or damage to equipment or facilities that could have been prevented by utilizing customary maintenance and repair practices. Such excuse from performance shall continue until the Force Majeure ceases to exist. A party declaring Force Majeure shall make commercially reasonable efforts to eliminate or resolve the condition, recognizing, however, that the settlement of any strike or other labor dispute shall be solely within the discretion of that party. As used in this Section, "reasonable efforts" shall include but not be limited to Shipper using its best efforts to ship tonnage from alternative Origins. If an event of Force Majeure affects Shipper's ability to load at one or more Origins and/or transport loaded tonnage to be unloaded at one or more Destinations, and Shipper has the capacity to utilize and/or increase the loading at an alternative Origin or facility to make up the decreased loading at the affected Origin, or redirect or increase the tonnage unloaded at an alternative Destination, then Shipper shall be obligated to do so pending the approval of Carrier, and in such case an event of Force Majeure shall not give rise to any reduction in Shipper's minimum tonnage obligations specified herein. A declaration of Force Majeure by anyone other than Carrier shall not excuse the accrual or payment of demurrage for a barge on demurrage status, nor shall it relieve Shipper from responsibility for a barge in its or its contractor's, subcontractor's or consignee's custody. When Force Majeure is declared with respect to a barge with remaining free time (whether the barge has been placed, constructively placed or is in transit), free time shall continue to run or will commence and continue upon placement or constructive placement, as the case may be; upon expiration of free time the barge will be placed in a demurrage status even if the Force Majeure event continues to exist. When a Force Majeure is declared with respect to a barge in transit, Carrier shall place or constructively place (as the case may be) such barge, and free time and demurrage will commence and continue to run in accordance with Part I, Section 10 herein. Any shortfall in cargo deliveries resulting from Force Majeure shall not be made up except by mutual consent of the Shipper and Carrier.

44. **New Taxes**: There will be added to the Base Freight Rate the amount of any new or increased Federal, State, or local taxes (except net income taxes) that may hereafter be charged to and paid by Carrier on account of the transportation services rendered hereunder, including the amount of any user charge, tax, or wharfage, port, harbor, or dockage fee imposed, levied, or collected for the use of the inland waterway system or of the locks and dams in said waterway system, wharfs, ports, or the use of the harbors and docks by Carrier while engaged in the transportation services rendered hereunder, or upon fuel used in performing such services, with such amount to be effective as of the effective date of any such tax, charge, or fee.

45. **Subcontracts**: Nothing herein shall prevent Carrier from subcontracting for any of the services provided by Carrier hereunder but Carrier will remain liable to Shipper for the proper performance of all of Carrier's obligations hereunder.

46. **Mitigation**: If all or any part of the cargo is discovered to be damaged while subject to this Agreement, Carrier, in its sole discretion, in order to minimize the damage, may sell the Cargo at public or private sale to the best advantage. In such event, Carrier shall, where practicable, provide Shipper and any known consignee with notice of the proposed sale. The proceeds of any sale made under this Section shall be applied by Carrier to the payment of freight, demurrage, storage, and any other charges and the expense of notice, advertisement, sale and other necessary expense of caring for and maintaining the Cargo, and the balance, if any, shall be paid to Shipper or consignee.

47. **Claims**: As condition precedent to recovery, claims must be filed in writing with Carrier within nine (9) months of delivery of the Cargo, or, in case of failure to make delivery, then within nine (9) months after a reasonable time for delivery has elapsed. Suits shall be instituted against Carrier only within two (2) years and one (1) day from the day when notice in writing is given by Carrier to the claimant that Carrier has disallowed the claim or any part or parts thereof specified in the

notice.

48. **Default**: No default of either party in the performance of any of its covenants or obligations hereunder, which, except for this provision, would be the legal basis for rescission or termination of this Agreement by the other party hereto, shall give or result in such a right unless and until the party committing such default shall fail to correct the default within thirty (30) days after written notice of such default is given to such defaulting party by the non-defaulting party. Notwithstanding anything in this Agreement to the contrary, there shall be no cure period for any payment default and each party shall have each and every other right afforded it under law against the defaulting party.

49. **Notices**: All notices, consents, determinations, instructions and communications provided for herein shall be validly given, made or served, if in writing and delivered personally, or by telegram, facsimile, electronic mail, overnight delivery or recognized courier service or sent by registered or certified mail, postage prepaid, to Shipper and Carrier at their respective addresses listed at the beginning of this Agreement, or as the parties may otherwise direct in writing. Any notice, consent, determination, instruction, approval, or other communication hereunder shall be deemed given and effective as of the date of delivery in person or by courier, or as set forth on the return receipt or facsimile confirmation.

50. **Independent Contractor**: Nothing contained in this Agreement shall be construed as a contract by Shipper for the chartering, hiring or leasing of any barge, towboat or other equipment of Carrier to be provided hereunder; nor shall any of the agents, servants, subcontractors or employees of Carrier be regarded as employees of Shipper, it being understood that Carrier is in all respects an independent contractor and that Shipper shall exercise no control over the operation of any barge, towboat or other equipment of Carrier or over Carrier's agent, servants, subcontractors or employees.

51. **Changes in Operation**: In the event Carrier's operating costs specifically related to the equipment, facilities, supplies, or services to be used or provided by Carrier under this Agreement are increased due to any law, rule, ordinance, regulation, restriction, directive, order, notice, advisory or interpretation, hereafter promulgated by any federal, state, or local authority, or any agency or division thereof, or any industry group advisory thereto, or any court, which is generally applicable to all barge carriers similarly situated, and such increased costs are not reimbursed to Carrier under any other provision of this Agreement, then Shipper shall reimburse Carrier monthly, following receipt of billing for the entire amount of such increase in operating costs that is fairly attributable to the services performed for Shipper under this Agreement.

52. **Surcharge Protection:** If the costs incurred by Carrier for third-party towing or any other third-party services required to complete the transportation of Shipper's cargo(s) under this Agreement are increased by such third-party facility owners or service providers through the application of an unanticipated, extraordinary surcharge, and such surcharge is not otherwise fully reimburseable to Carrier under this Agreement through Section 30 "Fuel Protection" or Section 51 "Changes in Operation", then Shipper shall reimburse Carrier monthly, following receipt of billing for the entire amount of such surcharge-based increase in Carrier's costs that is fairly attributable to the services performed for Shipper under this Agreement. For avoidance of doubt, "surcharge" as used in this Section shall include any reasonably unanticipated rate or cost increase levied or passed through by any third party service provider whose services are necessary to complete the transportation of Shipper's cargo(s) under this Agreement.

Notwithstanding anything herein to the contrary, Shipper agrees to pay to Carrier an adverse conditions charge equal to $550.00 per barge per occurrence following placement of a barge at its Origin or Destination or both (i) located within an area operating under the 'Action' phase of the Waterways Action Plan applicable to such area (copies available upon request) or (ii) located at or south of MM 204 on the Lower Mississippi River when the Carrollton gauge is 12 feet or above. If the adverse conditions exist at both Origin and Destination, the above charge will be doubled for each affected barge.

53. **Operating Restrictions:** In the event of ice conditions and/or tow restrictions which limit the ability of Carrier to engage in fully normal operations along the intended route from origin to destination, the following actions will be taken without any liability to Carrier:

Carrier shall notify Shipper of such conditions or restrictions via e-mail or facsimile and move the barge(s) loaded with Shipper's cargo to the closest point with normal navigation conditions on route to destination. Shipper will have forty-eight (48) hours from notification to either (i) reconsign the barge(s) to a destination with navigation conditions that allow normal Carrier operations, or (ii) accept the barge on demurrage at Carrier's prevailing rate at the closest point with normal navigation conditions on route to destination (as more particularly described below). All charges related to any change in destination shall be as mutually agreed upon at the time of the reconsignment request. Barge(s) that are not mutually agreed upon for reconsignment will be placed on demurrage at Carrier's prevailing rate as of the first 0700 following the forty eight (48) hours after Carrier's notification of the first 0700 following the barge's arrival at the closest point with normal

navigation conditions on route to destination, whichever is later. The barge(s) will remain on demurrage at Carrier's prevailing rate until normal navigation and operating conditions resume.

With respect to lock delays encountered by any barge(s) laden with Shipper's Cargo at any lock and dam structure, Carrier will automatically apply a lock delay charge for each affected barge equal to the then-current 'Lock Surcharge Rates' posted by Carrier on its website found at www.ingrambarge.com/resc.php under the 'Documents' section. Such posted rates may be revised periodically by Carrier in its sole discretion. Each affected barge will receive 12 hours of free lock time for each lock and dam structure during the trip. Following the expiration of the 12 hours of free lock time at any lock and dam structure, the lock delay charge will begin to accrue for each affected barge and will be deemed earned by Carrier. The accrual of the lock delay charges will cease when the tow containing Shipper's barge departs the lock chamber. Free lock time (i) begins when the barge arrives in the vicinity of the lock and dam structure and the vessel master has notified the lock master that the vessel is ready to lock through (ii) is separate and distinct from other free time allowed in this Agreement, and (iii) unused free lock time at any lock and dam structure does not aggregate or carry-over to another lock and dam structure or to another voyage. Subject to the "Payment of Freight" section above, Carrier will invoice Shipper for such lock delay charge(s) following the barge's arrival at destination.

54. **Miscellaneous**:

   A. **Conflict**: In the event any of the terms of the Shipper's confirmation differ or conflict with any provision of this Agreement, then the terms set forth in this Agreement shall prevail.

   B. **Assignment**: Shipper shall not be permitted to assign or otherwise dispose of all or any part of its rights or obligations hereunder without first obtaining the written consent of Carrier. Such consent shall not unreasonably be withheld, provided that any such permitted assignment or other disposition shall not relieve Shipper of its obligation under this Agreement.

   C. **No Waiver**: The failure of Shipper or Carrier to insist upon strict performance of any of the provisions of this Agreement in one or more instances or the failure of Shipper or Carrier to exercise any of its rights hereunder in one or more instances shall not be construed as a waiver of any such provisions or the relinquishment of any such rights, but the same shall continue and remain in full force and effect.

   D. **Binding Effect**: To the fullest extent possible, this Agreement shall be governed by the Maritime Laws of the United States of America; and thereafter this Agreement shall be governed by the laws of the State of Tennessee, both as to interpretation and performance, and all disputes that arise under this Agreement shall be resolved in accordance with Tennessee law. This Agreement shall be binding upon and inure to the benefit of the parties hereto, their successors and assigns, subject to the restrictions or assignability herein contained. Shipper hereby irrevocably consents to the jurisdiction of the United States District Court for the Middle District of Tennessee and its appellate courts, and/or any court of the State of Tennessee sitting in Nashville, Tennessee and its appellate courts, for the purposes of all legal actions and proceedings arising out of or relating to this Agreement.

   E. **Headings; Terms**: Except for the section headings set forth in Part I, Sections 1 through 11 which shall be terms defined by the meaning ascribed to them immediately thereafter, section headings in the Agreement are included merely for the convenience of reference and shall not be construed as part of the governing terms of this Agreement. The use of the words "barge" and "party" herein, whether or not capitalized, shall mean both the singular and the plural as intended by the parties.

   F. **Integration; Execution**: This Agreement sets forth the entire understanding between the parties hereto as to the subject matter and no amendment hereto shall be valid unless made in writing, and either (i) is duly signed by the parties hereto, or (ii) Carrier undertakes to place or constructively place barge(s) pursuant to such Amendment. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original hereof, and all counterparts collectively are to be deemed but one instrument. Whether or not Shipper executes this Agreement in the acceptance space provided hereon, loading of a barge shall constitute an acceptance of all the terms and conditions of the Agreement.

   G. **Setoff:** In addition to and not in limitation of any other right or remedy set forth herein, Carrier may without prior notice to Shipper set off any sum or obligation (whether or not arising under this Agreement) owed by Carrier to Shipper against any sum or obligation owed by Shipper to Carrier. Shipper shall not for any reason set off or reduce any sum or obligation owed by Shipper to Carrier for any reason.

   H. **No Interference**: Shipper represents, and by entering into this Agreement Carrier is relying upon Shipper's representation that Shipper has no relationship, agreement, contract, or other arrangement currently in effect or scheduled to take effect for which Shipper's or Carrier's entering into or performance of this Agreement would give rise to a claim by Shipper or any third party for wrongful or tortious interference, disruption or intermeddling. In the event that such a claim is made by any company, Shipper will protect, indemnify and hold Carrier harmless from and against any and all claims, losses, damages, injuries, liabilities, judgments, and expenses, including without limitation reasonable attorneys' fees arising from or related to entering into or the performance under this Agreement.

   I. **Interpretation:** In entering this Agreement both Carrier and Shipper have had a full and fair opportunity to negotiate

Contract No. 109339 / 27309

## PART II

at arm's length and to have legal counsel of respective choice review the terms and conditions herein. Accordingly, the Carrier and Shipper hereby waive any argument or claim based on one or the other being considered the draftsman of this Agreement.